and the Wind Tower Trade Coalition and the Government of Ontario, 2022-1807. Mr. Campbell. May it please the Court. I will begin with the Gaspisi tax credit program. The issue here is the proper interpretation of Section 351.509A, which defines the benefit of a direct tax program. Here, the plain language of this provision defines the benefit as the tax savings to the company as a result of the program. With respect to the Gaspisi tax credit program, Marmon received both a tax credit and also paid additional taxes as a result of the program on the exact same tax return. Contrary to the plain instruction of the regulation, Commerce limited the benefit to the amount of the tax credit, which is not in accordance with law. Now Commerce offered two justifications for its decision. First, it pointed to Section 351.503E, the tax consequences provision, but this provision precludes Commerce from considering the tax consequences of the benefit. And the benefit, again, is defined by Section 351.509A. So the tax consequences provision is not reached in the first instance because that provision is only reached after the benefit itself is calculated. Similarly, Commerce points to the statute, 19 U.S. I'm not sure I'm clear on why you're saying it. It seems to me 503E is pretty clear and it's applicable here. So what makes it inapplicable? It's not applicable because the plain language of 503E precludes Commerce from considering the tax consequences of the benefit. So before you even get to 503, you have to calculate the benefit. And the benefit for a tax credit program is Section 351.509A. So 503E is not reached in the first instance. A good way to illustrate this is by reference to grants. Section 351.504 defines the benefit of a grant as the amount of a grant. So then when you go to 503E, that precludes Commerce from considering the tax consequences of the amount of the grant. But in stark contrast, Section 351.509A does not define the benefit as the amount of the tax credit or the amount of the tax remission. It defines the benefit as the tax savings to the firm as a result of the program, which necessarily requires Commerce to consider not only the tax credit, but also the additional taxes paid on the exact same tax return. Commerce also points to 19 U.S.C. Section 1677.6, which is the net countervailable subsidy provision. Similarly, this provision is not implicated because it does not apply until after the countervailable subsidy under Section 1677.5 is calculated, which necessarily includes calculation of the benefit. I will now turn to the auditor's exchange rate adjustment. The issue here is Commerce's decision to reject an independent auditor's adjustment as unverifiable. So, Kelsey, what happened in verification with respect to the audited numbers? There were some errors that were found, correct, in the data? Was it in data that was provided during the course of the verification itself or in the submissions, the questionnaires that were provided before verification? There was no error in Marmon's questionnaire responses. Marmon reported its sales and the auditor's adjustment consistent with its record. There was an error in the calculation of the auditor's adjustment itself, but that error was isolated and immaterial. Marmon, in fact, identified and prepared in advance detailed listings of all the U.S. dollar sales included in the auditor's exchange rate adjustment to convert those sales to Canadian dollars. Marmon did so by account, and the five sales that were coded in euro were clearly marked in these listings in euro. In fact, these listings were prepared by account, and one of the accounts was limited to four sales, each of which was recorded in euro. So, the errors, they were discovered during verification? They were not discovered. Commerce, again, Marmon... I guess what I'm getting at, was it based on new data presented at verification or on the data that had already been submitted? The five errors were identified by Marmon in the U.S. dollar sales listings it prepared for Commerce for verification. Those sales were isolated and limited. After reviewing those sales and seeing that they were recorded in euro, then Commerce conducted spot checking, selected 12 sales in the U.S. dollar sales listings at random, and confirmed that each and every one was made and paid in U.S. dollars. So, this is important because in Commerce's auditor's adjustment, based on a claim that it discovered the five errors through spot checking, and that's absolutely false. The only spot checking that Commerce actually performed confirmed the accuracy of the adjustment overall. Those five sales were limited, isolated, immaterial. They accounted for less than 0.2% of the auditor's adjustment. Moving on from there... Based on those errors or the auditing issues that came up, Commerce made the determination that the entire database was tainted? In its final decision, Commerce made the decision that the auditor's adjustment was unverifiable and unreliable, and that essentially meant that Commerce rejected Marmon's audited sales revenue. It's also very important that in the summary of findings of the verification report, Commerce's auditors did not indicate or even suggest that there was any question about the reliability of the auditor's adjustment. In fact, the opposite. The summary of findings states and indicates that the auditor that confirms Commerce verified that Marmon, in the normal course of business, recorded U.S. dollar sales in its general ledger in U.S. dollars, and that the auditor's adjustment was required to express those sales in Canadian dollars. Commerce's decision here is based on a false premise, which is contradicted by its own verification report, and that's why Commerce's decision cannot be sustained as reported by Manufacturing Buildings. The issue here is whether Canada's depreciation rate for Manufacturing Buildings is accelerated or preferential. The answer is no. Here in particular, Commerce ignored an undisputed Canadian government study that established that the normal actual depreciation rate of Manufacturing Buildings is 10%. This means that the 10% depreciation rate for Manufacturing Buildings is not accelerated. It's not preferential, and because of that, there's no financial contribution. And what is your understanding about why Commerce, agreed to by the CIT, said no, no, no, this is preferential? Did they base it on what? Commerce engaged in a purely formalistic exercise. Well, they seem to think that the 4% was okay. So the 4% is okay, but the 6% isn't. So what is your understanding of how they differentiated the 4% versus the 6%? All Commerce did was this. Because both Manufacturing Buildings and Residential Buildings, two different types of assets that have different depreciation rates, actual depreciation rates, because they have different useful lives. Manufacturing Buildings have a shorter useful life than Residential Buildings, which is why Manufacturing Buildings are given a higher depreciation rate of 10%, while Residential Buildings are given a depreciation rate of 4%. Now, all Commerce did was look at the 10% versus the 4% and say, because both of those assets, Manufacturing Buildings and Residential Buildings, are under Class 1, that means that 10% is an accelerated or additional or preferential depreciation rate over the 4% rate for Residential Buildings. But that completely failed to address the substance of the argument we raised, which is that no, 10% is not an accelerated depreciation rate, because in fact, Manufacturing Buildings depreciate at a rate of 10%. Kelsey, you only have four minutes. You can continue or save it. Save the rest of the time for the rebuttal. All right, I'm just putting your argument for Ms. Newman in the last two minutes. May it please the Court, Nancy Newman. Commerce misinterpreted the statute's de facto specificity provision as to Quebec's on-the-job training program when it compared approximately 5,000 users of the program to all tax dollars. So how many users, what is your alternative? I mean, they use all corporate filings, right? Yes, Your Honor. What number do you see? And we're talking about the number in the denominator, right? What number do you think, what number should they use? We're talking about a denominator just from the perspective of the statutory provision of whether there was a limited number of actual users of the program. So in that case, we believe the eligibility, who is eligible for the program, has to inform those potential users. Here, you could have a non-profit entity as a taxpayer. They're not eligible for the program. You could have a holding company as a taxpayer. They're not eligible for the program. So does the program, whatever regulation or whatever sets up the program, do they identify these people, these groups of people are eligible or these groups of people are ineligible? Is that ascertainable readily? Well, from the perspective that the program says, again, under the lawful objective criteria of eligibility for the program, there has to be a qualified training program. You have to have a trainee or apprentice that's participating in the program. It cannot be a non-profit entity. It cannot be a government entity or related to a government entity. So our perspective is, first, just looking at the facts, yes, thousands of users in dozens of industries. That is not a subsidy that is narrowly focused on a discrete segment of the economy as an initial premise. In terms of what we would compare it to as potential users, we do have on the record, well, it shouldn't be all tax filers because they can't all use the program. But on the record, we do have a figure of folks that program. Using that statistic, we've got a 97% users of the program. Counsel, you limited yourself by agreement to two minutes? Yes, Your Honor. And the two minutes have more than elapsed. So let's hear from Mr. Kurland for the government. Good morning, Your Honors, and may it please the Court. This Court should sustain each of Commerce's four determinations on appeal in this case because each of them is supported by substantial evidence and otherwise in accordance with law. I'll start with the Class I Assets Program. I think there are two key aspects to Commerce's evidentiary determination here. The first is that Commerce determined in the records of course that the 4% rate is otherwise the default rate for these kind of assets. They're all included in Class I. Canada could have set up the system differently, but it did not. And so these assets kind of regardless of whether... Can you point it to me in the appendix? What were you talking about, the Class I? Sure. There are a lot of sites for that, Your Honor. There's one thing I was looking at that defines the Class I. It's okay. Sure. Well, my point is it's repeated, and I think it's important to get out all these sites. So let me do that. At page 8018 and 1905, that's the Government of Canada and the Government of Quebec respectively, not in the chart, but in their questionnaire response, each explaining that the 4% rate is the so-called basic rate. They say basic... It may be a basic rate, but we're talking about two different things. We're talking about two different types of depreciation for two different categories of assets, right? Respectfully, Your Honor, I would disagree because no, they're all in the same class, and that these assets have a basic rate of 4%, but you can qualify, and this is the second main point, at your option, you are eligible to request, or not request, but I guess step forth, a different rate of depreciation up to 10% if you have one of these assets, and that is particularly the chart that I think is most... I guess I'm really not, so maybe it will help you to help Noah. I don't understand, if you let the 4% go, what the difference is between the 4% and the 6%. They're all dealing with depreciation. They're dealing with reasonable categories of depreciation for different types of assets, and I don't understand why one is in and one is out. There's a default rate of 4% for all Class 1 assets. Then, if you meet certain qualifications, you can submit for an additional 6% for a total of 10% for those assets, but there's still... But they're different assets, though, aren't they? Well, I mean, everyone's building is a different building, but these are all Class 1 assets that are subject to a default rate of 4%. This is, again, a questionnaire response, and I have some charts to show you as well, but in Canada's Circular on this issue, this is at page 9548 of the record. I think this is the most distinct way that they combine both of those points. It says, if you do not file an election to put it in a separate class, the 4% rate will apply. That's what they refer to as the basic rate at page 8018 in 1905. Then, there are several places in the record where there are charts that show that for Class 1, these are all Class 1 assets, the rate is 4%. I'm looking at page 8037. Well, don't you have to put it in any kind of paperwork to get the 4%? Well, the statements on the record are that, if you do not do anything else, the 4% rate will apply. I think it is the case that you still have to submit your tax forms, and so you're going to the 4%. So, because there's a requirement that you submit an extra form to get this, this makes it a separate and different kind of benefit that's just differentiated from the 4%? It's a combination of the fact that there's a default rate and that it's optional and elective to submit an additional form. In fact, at page 8038 of the record, Canada's regulations itself, it discusses the fact that you don't even have to actually take the 10%. It says that if you elect, you may submit for additional depreciation up to 10%. And so, I agree with your honor that there aren't deep in the weeds legalities to this. What are the requirements to move from the 4% to the 10%? Are there requirements that you have to meet? Yes, there has to be. Again, they're all under Class 1, but to request the 10%, I think it has to be a building that was purchased after a certain time that has 90% of its floor space used for manufacturing purchases. Although, as the interveners appropriately point out, and as Commerce indicated at page 98 of the record in its issues and decision memo, it doesn't even apply to every industry. At page 2829 to 2830 of the record, one can see that there are certain industries that are even excluded, even if you a manufacturing building, you don't get it for those purposes. So, the point is that there's a default rate that absolutely applies to these buildings. At page 9548, that's precisely what Canada says, and it's circular, and it refers to it as the basic rate. But then, if you qualify, you can seek an additional rate. That also goes to what the trial court said at page 35. Let's go back. Does everybody qualify that wants to qualify, that wants to go from 4% to 10%? I'm concerned by your answers to Judge Croak. I'm beginning not to see a difference between the 10% and the 4%, so... One has to file an election form to get... Is that it? Well, one has to have a building, one has to have a building that's in that one that meets the criteria. That's what I'm asking you. What's the eligibility criteria that applies? If not everybody can get from 4% to 10%, those who get to 10% have to meet certain criteria, right? Yes, that's right. What is that criteria? The criteria is having a non-residential building that was bought after a certain date, for which I think it's 90% of the floor space is used for manufacturing purposes. If you own such a building, your basic depreciation rate will be 4%, but you can file an election to get essentially anywhere from 4% to 10% at your option under the regulation. But you say if you own a building, you can get 4%. You have to do something to get the 4%, right? I think what one has to do is simply file one taxes claiming the 4% depreciation. You have to claim the 4%, right. Can you look at page appendix 35? This is where this is... The product decision. Yeah, is analyzing this. Yes. And he says, rather, and he affirms, commerce reasonably concluded that where a taxpayer can opt in to more favorable treatment, it is reasonable for commerce to confine its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects economic reality. So all of this, I think everybody agrees, this reflects economic reality in terms of these depreciation. So there's favorable treatment under your view, and then there's more favorable treatment. So the favorable treatment is okay, but the more favorable treatment is not okay? I respectfully would disagree on a couple of points, or at least clarify. I think we don't take a position about whether this better reflects economic reality. Well, I'm dealing with what the trial court concluded. Right, right. I think it has some meaningful... I think we can assume that for purposes of argument. But no, it's not between different levels of favorable treatment. 4% is kind of the base depreciation rate, at least for this class under Canadian law, for all buildings. So it's not that, well, we're giving you some favorable treatment, and then we're giving you some more favorable treatment. I mean, they say it's the basic rate for depreciation. But if you have a manufacturing building, they're giving you a benefit where you can claim additional depreciation up to an additional 6% for your manufacturing building. And that's the point. Over the... It's a benefit, right? Right, right. That's how they set it up. They could have set it up a different way. They could have said all manufacturing buildings in this economy are subject to a 10% depreciation rate. They pay fewer taxes, and that's a benefit. Right, and a financial contribution. Wait, but your point, they could have set it up differently. So if they had set it up how? If they had said, okay, this is what you got to do for 4%, and this is what you got to do for 6%. Well, I think... Does that make it less of a benefit or less favorable? I think it would be a different case if it were simply the case that, like all other non-residential... If Class 1 says, essentially, all non-residential buildings 4%. If they say, all residential buildings 4%, and all manufactured buildings 10%, and it's not a matter of you, at your option, you can seek an additional up to 10%, and it's not that there's a default rate, that might be a different case, but that's not how Canada has set up its system. And there are, it's seemingly at their election up to 10%, and as the interveners point out, at 28, 29, 28, 30, there are certain manufacturing industries that are excluded. I also wanted to clear up a couple of important points on the auditor's adjustment issue, as a factual matter, a few factual matters. I want to make clear to the Court that, no, Commerce absolutely did not throw out all of their sales. Throughout the questionnaire process, Marmon reported the sales figures that were in their general ledger, which is exactly what Commerce used. Commerce used the figure that was in their general ledger. Late in the questionnaire process, Commerce, as it often does, asked for a reconciliation of the sales in the reporting database to the general ledger, because frequently they don't exactly. Marmon provided that reconciliation, but then added a line that they didn't really make much fanfare about, and didn't really tell Commerce about, saying, there's one line in the reconciliation that has a millions of Canadian dollars adjustment, which is this auditor adjustment for exchange rate issues. They had, in years past, not chosen to make such an adjustment, but as the record reflects, and Commerce discussed, but in this year they did. Commerce found that it was too late to use that for its preliminary results, and essentially said, we're going to check this adjustment at verification. It then asked Marmon to prepare a bunch of documentation for the verification, and this is the documentation that Marmon says, oh, we discovered it and provided it to Commerce. We would respectfully disagree with that characterization, because it's essentially what Commerce asked Marmon to provide for verification. Can I ask about the on-the-job training? Yes, of course. Okay. Why is it at least not correct that the denominator should not include if government entities are precluded from participating, if non-profit entities are excluded from participating? Were those included in your calculations that got you to the 0.2% or not? I'm not 100% sure, Your Honor, but my understanding is that this is corporate filers, and so I would think that government entities and non-profits would not be included, and it's actually closer to 1% than 2%. But the point is, the other side would be bad. I mean, tautological, right? If you're going to take the idea that we're going to compare the number of users of this program to the number of people who were eligible under the program, we're going to compare the number of people who filed for this program to the number that's the number of people who are likely to use the program, it's always going to be a really high number. But what Commerce did here, which is a methodological issue and for which Commerce receives great deference, matches up very closely with what the authoritative guidance at page 929 to 932 of the SAA, and I'll try to rattle off very quickly some of those options. The SAA says that the idea of the specificity test is an initial screen to winnow out only those subsidies that are truly broadly available and widely used throughout the economy. That's at 929. At 930, it says a similar thing. In fact, it's the own italics in the SAA that says, because of the widespread availability and use of a subsidy, the benefit is spread throughout the economy. 931 and 932, Commerce can take account of the number of industries in the economy in question, which suggests an industry-wide look, not this kind of plottological idea. And finally, and this is at 932, and I think an important aspect of this that may get overlooked, is it says, as under existing law and Commerce practice, evidence of government's intent to argue, I'm sorry, government's intent to target or otherwise limit benefits, parenthetically, that's referring to the de jure provision of the de facto specificity analysis. So, and their hypothetical is actually a great example of this, right? I'm going to tweak it slightly. They talk about, well, what if the subsidy was given to anyone with disabilities? I think you're not going to be able to tweak it, Mr. Perlin. You've got three minutes. Thank you, sir. Because I believe Mr. Perlin has covered the basis with regard to the depreciation program and the net sales denominator, I'll focus on the gastrocyte tax credit. And Judge Prost, you had asked a question about the interpretation of forward. And I find their interpretation very strange, frankly. I think it relies on a very cramped and odd interpretation of the word program as used in that regulation that fails to take into account a few things. One, that the regulation regards a number of different kinds of tax subsidies. And the word program, to me, seems most naturally to be read as simply referring to any of those particular types of subsidies and not indicating that the program itself implicates both tax gains and tax losses considered collectively. The other thing is the direct tax regulation also specifically equates the benefit of a tax exemption or remission, rather than a program more broadly, with the taxes avoided by reason of an exemption claimed in a specific tax year. And that's 19 CFR 351.509B, which Commerce itself cited in its decision memo at Appendix 125. I think the fact that the definition of the benefit is related to the claim you make in a specific tax year as to an exemption or remission further undermines Appellant's construction of the word program and indicates that the benefit of a tax credit is the amount saved by the claims the credit has made as to that specific tax year and doesn't indicate any taxes you pay on claims you made as to prior years. Commerce's methodological choice to ignore the tax consequences of direct tax programs is also very longstanding and very consistent. Below, Judge Cashman, in preparation for oral argument, asked the parties to identify any cases they could find in which Commerce had taken the approach that Appellants favor with respect to this regulation, and they could not find any. I am still not aware of any in which Commerce has calculated a tax benefit in the way that Appellants say is clear under the regulation. I simply find it not clear, and what Commerce did appears to be both consistent with their just make one point about the on-the-job tax credit, which is you asked Judge Frost, what's the number, what's the denominator you want? And the answer given to me is compare the users to the users. It's tautological, as Mr. Kerland pointed out, and I would say the Appellant's approach has some particular difficulties in that it's probably in many cases very difficult to figure out who has technically done the things required to get a benefit but never made a claim as to it. Here, it seems very reasonable to me for the agency to... But you do agree that it would be fair to Cabinet, which I think Commerce did, to those that are eligible. So it depends on how you define eligibility. Is eligibility everybody who actually performed the actions or everyone who was able under law to perform the actions? Well, it's the latter, I think. Yes, I agree with you. Everybody under the law able to perform the actions required to take the credit and corporate tax filers is the nearest analog that we have to that here on this record. Thank you, Your Honor. Thank you, Counsel. Mr. Campbell has the rebuttal time. Thank you, Your Honor. Regarding the depreciation rate for manufacturing buildings, it's important here to understand Commerce's long-standing practice. Commerce does not simply countervail depreciation deductions. Those are taken in the normal course of business under a multitude of tax regimes, including the United States' tax regime. Commerce only countervails a depreciation deduction for an asset if it is accelerated. And here, the undisputed record evidence... Actually, it's undisputed that 10% itself is the actual depreciation rate of manufacturing buildings. And below, Commerce did not confront this argument. It paid lip service to it. It said it disagreed with it, but then it retreated to its formalistic analysis that 10% is accelerated simply because a different asset, a residential building, has a shorter use of life and a smaller depreciation rate of 4%. Also, it's incorrect that any company with a manufacturing... It's incorrect that not every company can qualify for the 10% depreciation rate for manufacturing buildings. As long as that company owns a manufacturing building, it can claim the 10% rate. And this is at Appendix 8037 to 8038. Regarding the auditor's adjustment, it's very important for the court to understand Commerce's longstanding practice here. Commerce's action, its decision to reject an independent auditor's opinion, is extreme and extraordinary. Commerce has indicated in butt-weld pipe fittings that it would require compelling evidence to do so. Here, Commerce did not even have substantial evidence, let alone compelling evidence. Also, again, it's very important. Commerce relied on a false justification to reject the auditor's adjustment as unverifiable and unreliable. Commerce claims that it identified the 5 euro coded sales through spot checking. Again, that's absolutely false. The only spot checking that Commerce actually conducted, selecting 12 US dollar sales at random, confirmed the accuracy of the auditor's adjustment overall. And in fact, Commerce had a full extra day. It could have continued. We would have appreciated it if Commerce had spent an entire day spot checking sales because the auditor's adjustment was accurate and Commerce lacked any evidentiary basis to infer that there were other errors when its spot checking showed the opposite. Instead, that's pure speculation on Commerce's point, which is not substantial evidence. Again, the summary of findings in the verification report states that the auditor's adjustment was required to express Marmon's sales denominator in Canadian dollars, which is necessary to calculate an accurate CVD rate for Marmon. Commerce knowingly relied on a distortion, which is to calculate Marmon's sales denominator, which is inconsistent with its statutory obligation to calculate CVD rates as accurately as possible. Lastly, regarding the GASBZ tax credit program, we are the only ones giving effect to the plain language of the regulation, which states that the benefit amount is the tax savings as a result of the program. And as far as specific tax year, we agree. We're asking Commerce to measure the benefit by taking into account both the tax credit claims on the tax return filed by Marmon during the period of investigation, as well as the additional taxes paid as a result of the program on the exact same tax return. Thank you very much, Your Honors. Thank you, Counsel. We appreciate all arguments and cases submitted.